# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
October 24, 2023 Session

## STATE OF TENNESSEE v. KARLA MARIE CLAUSELL

**Appeal from the Criminal Court for Bradley County**
**No. 20-CR-304        Sandra N.C. Donaghy, Judge**

_____

### No. E2022-01662-CCA-R3-CD

_____

Defendant, Karla Marie Clausell, appeals as of right from her conviction for first degree premeditated murder, for which she is serving a life sentence. On appeal, Defendant contends that the trial court erred by admitting evidence from Snapchat in violation of Tennessee Rule of Evidence 404(a) and by admitting Snapchat and Facebook messages in violation of Tennessee Rule of Evidence 404(b). She also contends that the cumulative effect of these errors entitles her to a new trial. After a thorough review of the evidence and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and MATTHEW J. WILSON, JJ., joined.

Patrick Frogge, Executive Director, Tennessee District Public Defender's Conference; Kendall Stivers Jones, Assistant Public Defender—Appellate Division; and Donald Leon Shahan, Jr., District Public Defender, for the appellant, Karla Marie Clausell.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Shari Tayloe, District Attorney General; and Aaron J. Chaplin and Paul O. Moyle, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural History

This case arises from the September 20, 2019 shooting death of Miranda Stamper ("the victim"), which was the end result of a months-long conflict between the victim and Defendant that largely unfolded over social media.

### a. Pretrial proceedings relevant to social media evidence

Before trial, Defendant filed a motion seeking "on the record findings pursuant to Rule 403 and Rule 404." In the motion, Defendant argued to exclude Rule 404(b) evidence until the trial court held a Rule 404(b) hearing outside the presence of the jury. The trial court granted the motion and noted that the State would comply with the procedures outlined in Rule 404(b) prior to introducing such evidence.

In a motion in limine filed by the State prior to trial, the State requested pretrial rulings on specific evidence for the purposes of opening statements. The State referred to two April 14, 2019 Facebook messages in which Defendant told the victim that, if they fought, she had "[b]etter come with a bullet[]proof vest" and that "if your friends get in this 42 ain't finna hit soft." The State noted that Defendant used a Glock 42 pistol to kill the victim and argued that the messages were relevant to premeditation, motive, intent, lack of mistake, and context.

Before opening statements, the trial court noted that both parties wanted to use evidence of threats made on Facebook in opening statements and that the evidence spoke to "the entire relationship; the ongoing dispute; and therefore goes to knowledge[,] completing the story, premeditation and intent." The court stated that it would give a limiting instruction when the evidence came in during trial that it was only to be considered as evidence of intent, guilty knowledge, and to complete the story of the crime.

### b. State's proof

At trial, Matthew Warnock testified that he owned the Chattanooga Billiard Club Cleveland ("CBC") and that, on September 20, 2019, he arrived at CBC before midnight after bartender Jordan Belcher called him and reported that a shooting had occurred. Mr. Warnock stated that he provided the police with surveillance recordings from six interior cameras; two cameras mounted outside CBC had been damaged by water and were not functioning on the night of the incident.

Mr. Warnock testified that patrons could only enter CBC from a "right-hand door" beside a fenced-in patio, which had its own door leading inside. Mr. Warnock identified photographs of the area outside CBC, which depicted CBC's entrance door and adjacent covered patio, a parking lot facing the patio area, an access driveway on the far side of the parking lot, and a concrete patio and walkway beyond the driveway.

The CBC surveillance recording was entered as an exhibit and reflected CBC's interior from the entryway area; the camera was mounted above the door leading to the patio, although the patio door and adjacent front door were not visible. CBC consisted of a large, rectangular open area with pool tables; in the center and center far end of the long side of the space, several patrons were seated and standing at high tables. Mr. Belcher testified that the victim was at the high tables, although she was not initially visible in the recording. After several minutes, a woman wearing a blue jean jacket and shorts, whom Mr. Belcher identified[1] as "Karla," entered CBC; she was accompanied by another woman. Defendant and her companion walked the length of the pool table area, passing close to the people at the high tables where Mr. Belcher indicated the victim was located. Defendant immediately turned around and walked back past them, slowed down and turned her head as though she was speaking to someone, then continued walking toward the door while putting her hair up. The victim, who was wearing a black tube top and striped pants, followed Defendant and her friend and began pulling her hair back. At one point, Defendant turned and spoke to the victim, and the victim responded and clapped her hands together a few times. Defendant continued walking; as she exited CBC's front door, she held the left side of her jacket and placed her right hand inside it. The victim paused and spoke to someone out of the right-hand side of the camera frame, then exited CBC. About one minute elapsed between the time Defendant entered and exited CBC.

Mary Beth Green, Brittany Byers,[2] and Charlice[3] Pugh all testified that they were at CBC on September 20, 2019, and spoke to the victim before the shooting. They were sitting at one of the high tables when the victim joined them. Ms. Green, Ms. Byers, and Ms. Pugh all described the victim as being in a good mood and happy, but that her demeanor changed when she saw Defendant. They stated that Defendant passed them, turned around, and approached the victim. Ms. Green was also acquainted with Defendant and was aware of "snap-chats going back and forth" between Defendant and the victim; she did not know "all the history" of their relationship, and she did not recall any specific social media messages.

---

[1] When asked whether he saw Karla in the courtroom, Mr. Belcher answered negatively. He stated, though, that the woman he saw fighting the victim was the woman in the video wearing a blue jean jacket.
[2] Ms. Byers' surname at the time of trial was Matson.
[3] Ms. Green and Ms. Byers referred to Ms. Pugh as "Alexis."

None of the women could recall what exactly Defendant said to the victim, although Ms. Green stated that Defendant was "instigating it" by asking the victim to come outside to fight. Ms. Byers said that Defendant looked "upset and determined," and she noted that she could tell the victim and Defendant did not like each other and that it was "pretty volatile." Ms. Green, Ms. Byers, and Ms. Pugh followed the victim and Defendant outside.

Kiara Mitchell testified that she also saw the victim at CBC and stopped to greet her; the victim told her that "she was about to go outside and beat [Defendant's] a--." Ms. Mitchell did not know why the victim was going to fight Defendant.

CBC employee Ashley Nelson testified that the victim told Ms. Nelson as she was walking outside that she was going to fight; Ms. Nelson, in turn, informed Mr. Belcher what was happening, and they followed the victim outside. The crowd in CBC's patio area included Christopher Headrick and Kaleb Coffel. Mr. Belcher, Mr. Headrick, and Mr. Coffel all eventually intervened after the shooting.

The witnesses testified generally that Defendant and the victim stood in the access driveway area exchanging words; no one heard what exactly was said. Mr. Belcher and Ms. Nelson saw Defendant throw the first punch. Several witnesses stated that both women went to the ground while trading blows.

Mr. Belcher, Mr. Coffel, Mr. Headrick, Ms. Green, Ms. Byers, and Ms. Mitchell testified that they heard three gunshots; Ms. Pugh and Ms. Nelson heard only two gunshots. Two of the gunshots were consistently described as having occurred in quick succession.

Mr. Belcher and Ms. Byers testified that they heard the first gunshot while the women were on the ground. Ms. Green testified that all three shots were fired when the victim was walking away from Defendant and Defendant was on the ground. Mr. Coffel testified that the first gunshot occurred when the women were "toward each other" and the last two gunshots occurred when they were on the ground. Mr. Headrick was looking away from the women at the first gunshot, but stated that the second shot occurred when the women were "tussling around" and the third shot occurred when the fight was "slowing down a lot[.]" Ms. Pugh said that both of the shots occurred when the victim and Defendant were standing and fighting one another. Ms. Mitchell testified that Defendant was on the ground when the shots were fired, and she told police that Defendant continued fighting the victim after the gunshots.

Several witnesses stated that they did not see a gun until Mr. Coffel wrestled a pistol away from Defendant. Mr. Coffel explained that Defendant was on top of the victim, stood up over her and started to walk toward the next parking lot, and pointed the pistol as if

- 4 -

"about to shoot her again." Mr. Coffel said that he grabbed the pistol and that Defendant "was trying to fight, and turn and shoot [him]." He stated that he "threw an elbow into her eye, and in the back of her head – took her down, and took the gun." Mr. Coffel stated that he dropped the gun's magazine, cleared the chamber, and placed it in his back pocket. Mr. Coffel said that he told Defendant, "[Y]ou possibly just killed her," and that Defendant responded, "I don't give a f--k, she swung at me."

Mr. Belcher asked Defendant, "What did you do? Why did you do this?" before telling Defendant that the police were on their way and that she would go to jail. He stated that Defendant replied, "Honestly, I don't give a f--k. I hope I killed the b--ch." When asked to describe Defendant's demeanor, Mr. Belcher stated, "I'll never forget it. She looked evil, man. And she . . . was very unsettling" and seemed "rather lethargic."

Ms. Nelson testified that Defendant's demeanor was "[c]old. No remorse." When asked to elaborate, Ms. Nelson said that Defendant was "staring into space" as someone held her on the ground.

Mr. Headrick took over for Mr. Coffel and held Defendant from behind such that they were both on their knees. Mr. Headrick said that Defendant kept trying to pass a cell phone to one of her friends, a woman with brown curly hair; he noted that Defendant said, "Take my phone and get out of here, the police are coming." Mr. Headrick stated that he tried to get the phone away from Defendant but that her friend took it and started walking toward the parking lot, at which point Defendant stopped moving and sat still.

Regarding the duration of the fight, Mr. Belcher testified that "it was more or less one, two – it was one hit down to the ground – shots fired." Mr. Belcher agreed that he told the police that the women were on the ground for two or three seconds before he heard the first shot. Ms. Nelson estimated that the fight continued for less than one minute before she heard the gunshots. Mr. Headrick stated that the fight and shooting happened in seconds. Ms. Green estimated that less than fifteen seconds elapsed between the time she came outside, at which time the victim and Defendant were already fighting, until the shots were fired. Ms. Pugh described the fight as lasting a "couple minutes" before she heard gunshots. Ms. Mitchell stated that the women were on their feet "for a split second" before they ended up on the ground "tussling, rolling."

Cleveland Police Department ("CPD") Sergeant Dax McGowan and Officer J.R. Burnette were among the first officers to respond to the scene of the shooting. They testified that the victim was on the ground and that Defendant was being held down nearby. Sergeant McGowan directed another officer to handcuff Defendant, retrieved the pistol from Mr. Coffel, and placed it beside him on the curb as he began CPR on the unresponsive

- 5 -

victim. He later instructed Officer Burnette to collect the pistol; both officers testified that Mr. Coffel returned and picked up the pistol before Officer Burnette could get to it. Officer Burnette retrieved the pistol from Mr. Coffel and pulled back the slide to clear it, at which point a shell casing ejected into a nearby mulch bed.[4] After the scene was secured, Officer Burnette placed the pistol beside the ejected shell casing. Another shell casing was found underneath the victim's body.

Sergeant McGowan stated that, typically, a Glock pistol would eject a shell casing after a bullet was fired. He noted that "holding on to the magazine, or rolling on to the upper receiver when it's fired" could cause a gun to malfunction and that, if a person did not pull the slide back all the way backward when clearing a gun, a shell casing might not eject.

Officer Burnette testified that a spent shell casing might not eject due to "[a]nything that restricts the slide movement." He continued that, if the gun was up against something "or anything pushed and held on to it from the back, or held on to it," the "ejector cannot grab a hold of the . . . back of the round and eject it out."

Former CPD Officer Dustin Moorehead also responded to the scene of the shooting. After Mr. Headrick advised Officer Moorehead that Defendant's companion had run away from the scene, Officer Moorehead looked for her and eventually found her leaving CBC's back parking lot. Officer Moorehead flagged the car down and asked the woman, whom he identified as Desiree[5] Hernandez, if she knew anything about the shooting; she responded that her friend shot the gun. Officer Moorehead made Ms. Hernandez return to the parking lot, placed her in his squad car, and transported her to the police station.

CPD Detective Brett Taylor testified that he spoke to bystanders and later photographed Defendant at the police department. Detective Taylor identified photographs of Defendant, which reflected a "scrape with some redness" on Defendant's face under her right eye on the cheekbone; "maybe a fingernail scratch right at the jaw-line"; "scuffs" on the second knuckles of her middle, ring, and pinky fingers; a small scrape on her right knee, and a small abrasion "above the small toe" on her left foot. Detective Taylor also swabbed Ms. Hernandez's hands for gunshot residue (GSR).

Detective Taylor acknowledged that an "indention area" above Defendant's right eye could "[s]omewhat" look like a knot. He agreed that a "bruise" under Defendant's

---

[4] Mr. Coffel maintained that he cleared the pistol when he took it from Defendant. He had significant experience with firearms and could not explain how the shell casing came to be in the pistol's chamber.

[5] Ms. Hernandez is also referred to in the trial record as "Destiny," "Deziray," and "Dezirae."

right eye and a fingernail-type scrape on Defendant's jaw were consistent with "some type of trauma." He stated that the wounds to Defendant's knuckles were consistent with a punch. He stated that Defendant's knee scrape could have resulted from "kneeling or something from the ground, possibly." On redirect examination, Detective Taylor testified that Defendant's injuries were also consistent with having been elbowed in the face and "taken to the ground."

CPD Detective Shane Clark testified that he was a crime scene investigator and helped to process the scene of the shooting. He took photographs and collected evidence, including the pistol, two shell casings, and blood swabs from the pavement.

Detective Clark testified that he performed a Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) "trace" on Defendant's Glock 42 pistol. The ATF report included Defendant's Firearms Transaction Record. According to Detective Clark, the report reflected that Defendant purchased the Glock 42 pistol on January 27, 2018, at George's Pawn Shop in Cleveland. The serial number matched the pistol from the crime scene. A copy of Defendant's application to purchase a firearm was attached to the report and reflected that she denied having a felony criminal record or any pending felony charges. Detective Clark testified that he also documented the victim's injuries and collected her clothing at the hospital.

On cross-examination, Detective Clark testified that, to his knowledge, GSR "primer powder" only appeared on an item or person when a gun was fired. He stated that the victim's tube top contained one hole in the middle. He agreed that Defendant purchased the pistol more than one year before the incident.

The following exchange occurred:

Q. Now, in order to purchase this gun, this shows that this gun was legally purchased at George's Pawn Shop, correct?

A. Yes, sir.

Q. Okay. Now, would that require an ATF background check to purchase it?

A. It should, yes.

Q. Okay. So, it's reason to believe that she would have passed that background check if she legally purchased the gun, and we have an ATF receipt to that, correct?

- 7 -

A. Yes, sir.

### c. Jury-out hearing relative to social media evidence

During a recess, the State requested a jury-out hearing pursuant to Tennessee Rule of Evidence 404(b). CPD Detective Matthew Landolt testified at the hearing that he obtained search warrants, covering February 2019 through September 20, 2019, for Defendant's Snapchat and Facebook accounts. He stated that he received in excess of 10,000 pages of Facebook material, thousands of Snapchat files, and a large amount of audio and video recordings. He explained that he had composed a PowerPoint presentation[6] with more than seventy pages of Facebook material and sixty media files, which were placed on a flash drive for trial.

Detective Landolt testified that Snapchat's file names reflected the date and time in Coordinated Universal Time (UTC), which was four hours ahead of Eastern Daylight Time or five hours ahead of Eastern Standard Time. The Snapchat files were divided into ten-second increments; Detective Landolt stated that a viewer would have seen one continuous video and that the segmented format was how Snapchat transmitted the files. For simplicity, we will use the initial starting time of the first video file to refer to the files that collectively depict one span of time.

### i. February 14, 2019 Snapchat video

The flash drive exhibit contains one Snapchat video file from February 14, 2019, ("the Walmart incident") which consists of two sections—one taken by Defendant inside a Walmart where the victim is working, which consisted of Defendant's approaching the victim while commenting negatively on her appearance; the victim responded that she was working and asked Defendant to leave before she called security. The second section depicted Defendant's face as she walked through the Walmart parking lot. Defendant talked to the camera about a person who had been talking badly about her but had nothing to say in person. She directed expletives at the person and her family; in context with the first video, it was apparent that Defendant was discussing the victim. Defense counsel stated that he was not objecting to the first section of the Snapchat video because it depicted both Defendant and the victim; accordingly, the first section of the video was not played at the jury-out hearing.

---

[6] The PowerPoint presentation was not entered as an exhibit or included in the appellate record. The record contains one flash drive containing the individual Snapchat video recordings and Facebook audio recordings (Exhibit 32) and a paper copy of the seventy-eight-page Facebook record excerpt (Exhibit 35).

ii.      September 9, 2019 Snapchat video

The State played a September 9, 2019 Snapchat video, in which Defendant, who was in a car, nodded along to a rap song and mouthed "pop" or "pow" with the lyrics while she mimed shooting toward the camera while holding a black pistol. Defense counsel argued that the video was duplicitous and prejudicial because it had "already been established that she owns that weapon" and had legally purchased it. Defense counsel stated that the September 9, 2019 video was close to the time of the offense but that the video had "no threat to the victim in that, there's no mention of the victim in that. It is highly prejudicial in the fact that she's holding a gun to a rap song doing that. We've already established that she owns the gun."

The State responded as follows:

> Your Honor, on cross-examination of Shane Clark, the [CPD] Crime Scene Technician, the question was posed by defense counsel, regarding the ATF certified form, which is in evidence in this case. And the question was[,] "So this means [D]efendant 'passed an ATF background check,' . . . " implying good character. 404A, Your Honor . . . permits the State[,] once a character trait of the accused is raised, the State may rebut that with evidence to the contrary. Now, what we have here, are videos of this individual in possession of a firearm. Possession of the firearm can be established by the date and timestamp, as Detective Landolt has now referenced.

> Your Honor, will see that in several of these files as we go later on down the road, [D]efendant is a user of marijuana. She talks about using blunts, she talks about smoking. She talks about . . . going outside to smoke at La Pachanga before an incident occurs between her and the [victim]. Well, that is a felony offense. A user in possession of a firearm is a violation of 18 United States Code [section] 922, I believe it's Subsection (g) . . . . The defense opened the door, they didn't have to ask questions about, well she . . . legally purchased this by passing a background check. The question could have just been asked [if] she legally purchased this. They went the step further in making a character trait an issue before this Jury, and the State is now entitled to break down the door, having it been opened by the defense in this case.

Defense counsel responded that the recordings did not show criminal activity, that it was not illegal to possess a gun, listen to rap music, or say "pop-pop," and that the videos

- 9 -

did not rebut that Defendant passed an ATF background check or was eligible to purchase a firearm. Defense counsel argued that he had not opened the door to character evidence with his questioning.

When the trial court asked the State what pertinent character trait was at issue, the prosecutor responded, "It's general good character, Your Honor, which is I believe is [the] character trait of lawfulness . . . . If you pass a background check, that means you are a lawful, good citizen. Lawful, good citizens don't use illegal drugs. It's to rebut that good citizen character trait."

The trial court noted that no illegal drugs appeared in the videos and that it did not know whether waving a gun around to rap music showed a lack of truthfulness, although it evidenced recklessness. The court stated, though, "When I heard the question that she lawfully[] acquired the firearm, and then the follow-up question, and she passed a background check, I immediately drew the conclusion she has no prior record. And so, I think it's a proper assertion that that puts into issue . . . her trait for lawfulness."

The State noted that it was not arguing that the conduct in the videos themselves was illegal but that, "when you take it in context of the other messages, it would be further proof, or proof of illegal possession of a firearm in violation of Federal Law." After some discussion of the structure of the federal statute, it was discussed that 18 U.S.C. § 922(g) made it illegal for "any person who is an unlawful user of or addicted to any controlled substance" to "possess in or affecting commerce, any firearm." The State asked the trial court to take judicial notice that, according to the ATF report, Defendant's Glock 42 pistol was manufactured in Smyrna, Georgia.

The trial court took judicial notice of the exhibit and found that Defendant's Glock 42 pistol was subject to federal law as a result of its being in interstate commerce. The court noted that the ATF report exhibit contained three separate documents, including the "actual tracking of the weapons itself," and that "this thicker package speaks to her application, and qualification to purchase." After some argument over whether a violation of federal law could be proven using previous drug use, the State averred that it could prove that Defendant was using marijuana on the dates of the respective videos.

The trial court stated,

So, I think, if the April 14th date is going to show her using marijuana, and that same day she is in possession of the gun; if she possessed the gun after the use, that's clear evidence of lawlessness. Which is the character trait that

- 10 -

has been put into evidence, as a result of her passing the background check, which leads to the inference that she has no prior criminal convictions.

. . . .

I think the conclusion that I drew, and probably other finders of fact would be that she does not have a prior criminal record which puts into issue the character of the accused for lawfulness, and 404A(2) allows that to be rebutted. I'm sorry. 404A(1) character of the accused. So, I am going to permit the State to play the video of her dancing with the gun on April 14[] 2019, and September 9[], 2019, because of that federal law; if the State shows that she was using marijuana that same time.

iii.     April 14, 2019 La Pachanga Snapchat videos

a.  8:00 UTC video

Detective Landolt continued his testimony, stating that an incident between the victim and Defendant occurred at La Pachanga nightclub in Chattanooga on April 14, 2019, and that one of the social media videos referenced it.

A collection of videos time-stamped beginning at 8:00:48 UTC ("the 8:00 UTC video") was played for the trial court. In the video, Defendant faced the camera and began filming midsentence; some of the individual files did not appear to be connected[7] to the other files and contained pieces of sentences. Defendant's dialogue was as follows:

[F]--king a-- f--king b--ch wearing them Walmart a-- f--king shoes. B--ch is wearing, b--ch is wearing f--king Walmart sandals, b--ch get the f--k out of here and go back home you f--king ugly-a-- b--ch.

. . . .

She didn't hit me. She hit one of the bouncers, so she's not allowed in La Pachanga no more, you hear me? They locked . . . my a-- up, there was three n---as holding me, they didn't . . .

---

[7] The first six files were marked as having occurred at 8:00:48 UTC, and it is not apparent whether the files are on the flash drive in the order in which they were recorded. For the sake of accurately conveying what was probably played for the trial court, and later the jury, we have not attempted to reorder the snippets.

- 11 -

. . . .

Oh, but now she can't give me her f--king address cause she's alone.  B--ch I'll beat the f--k out of you, I ain't your friend.  And I have something in the car for all of y'all b--ches, like I'm ready b--ch, y'all lucky they locking . . .

. . . .

. . . not let me go till those dusty a-- b--ches left, you hear me?  I'm on my way home, I'm calling Miranda because she was so hard with her friends, ok?  I'm calling that dusty a--, E.T. looking . . .

. . . .

So, I'm at the club, minding my f--king business, you hear me, I go outside and smoke a blunt, bro, and I'm chilling, you hear me, and I see Miranda, dusty-a--, bro, she talking to the bouncer . . . .  [S]he threw a bottle.  Dusty, dumb, bum b--ch who can't even afford a real drink.  You're here to drink your f--king beer, like, ok.

But them f--king dusty-a-- braids, this b--ch is still wearing the same braids she was wearing in 2014, bro, like if you go back like, bro, she is still wearing the same braids she was wearing in 2014.  I'm done, I don't even want to talk no more, guys, I'm chilling, I had a good-a-- time bro, I feel good as f--k, I'm about to f--king roll me a blunt, watch some TV, and f--king relax in my own house that I pay my own bills while this b--ch sit in her mama['s] couch, you hear me?  Ha.

Detective Landolt testified after the recording was played that Defendant referenced a "blunt," meaning marijuana.  The State asked the trial court to note Defendant's statement that she had "something in the car for them."

On cross-examination, Detective Landolt testified that the timestamp on the 8:00 UTC video equated to 3:00 or 4:00 a.m. on April 14.  When asked whether a blunt could refer to hemp or "CBD," he responded that the most common usage was to refer to marijuana.  He acknowledged that he did not ask Defendant to clarify the reference.

On redirect examination, Detective Landolt testified that he found additional videos detailing Defendant's drug use in the social media evidence, including one in which

- 12 -

Defendant ran her hand through an "exceedingly large bag of marijuana."[8]  Upon examination by the trial court, Detective Landolt stated that he did not remember whether the video with the bag of marijuana was dated before or after April 14, 2019.  He noted, though, that he recalled seeing "a significant amount of either videos, pictures, or references to marijuana, in the totality of the images, videos, messages that [he] reviewed."

The trial court supplemented its findings and stated that "if [Detective Landolt] subpoenaed records from February of 2019 through the date of the incident, which was 9-20-19, this would have been covered by that period."  The trial court concluded, in light of Detective Landolt's testimony, that there were "numerous references and numerous photos" of marijuana, that Defendant's marijuana use was "an on-going issue."

The State noted that it had previously redacted a portion of the 8:00 UTC video in which Defendant stated, "I was at the bar hanging out, I went outside and smoked a blunt," because the State "figured it was too prejudicial."  The trial court responded, "Well, it's coming in because it makes her gun-dancing illegal."  The State added that it was not going to "show the marijuana" and was asking the trial court for permission to play the first six seconds of the recording, which was limited to Defendant's above-quoted statements.

The trial court found that the reference to marijuana was "relevant to the [c]ourt under a 404 analysis . . . because it shows the possession of a gun with a user [of] illegal [drugs], going to the character trait of lawfulness."

b.  7:48 UTC video

The State played a second collection of videos, which were time-stamped beginning at 7:48:28 UTC on April 14, 2019, ("the 7:48 UTC video") and consisted of Defendant's speaking to the camera initially in a conversational tone before becoming angry.  Defendant stated:

> Listen, so I walk into the bar, and I see Miranda, b--ch a-- hoe, bro. And then, so, ok, Imma stay there b--ch cause what's up, but . . . [t]his b--ch wanna come and throw a bottle at me, bro, and like the bouncers would not f--king let me go outside . . . . And I'm calling this b--ch right now like, what's up, like she want to act all hard because she's with her little b--ch a-- friends.

---

[8] This video was not played for the trial court, and it is not part of the trial record.

F--king ugly-a-- gorilla-looking-a--b--ch. You know if I catch you by yourself, b--ch, I'll beat the f--k out of you, I'll beat the f--k out of all of y'all b--ches, and you're lucky, b--ch, cause, y'all motherf--kers know I'm never lacking, b--ch, like I'm never motherf--king lacking, b--tch, I'm ready to fight one-on-one, what's up, anybody, b--ch, but you come playing with me, b--ch, Imma [unintelligible] all of y'all b--ches, you hear me? You hear me? Cause y'all wanna f--king take videos and s--t, b--tch, f--k you and f--k all of y'all ugly-a-- b--ches, f--k you mean, b--ches.

Detective Landolt continued his testimony and stated that the term "never lacking" meant "never lacking a firearm on you, or never unprepared for a fight." He agreed that Defendant was wearing the same outfit in all of the April 14, 2019 videos. The State submitted that the series of videos had established that Defendant possessed the gun while she was a user of marijuana.

c. 8:28 UTC video

Although it is unclear when the State played a collection of videos time-stamped beginning at 8:28 UTC on April 14, 2019 ("the 8:28 UTC video"), we glean from statements at the hearing that it was played. In the recording, Defendant was standing in front of a shower wearing the same floral top visible in the other April 14 recordings. She also wore black shorts and a black fanny pack. Defendant stated as follows:

Cause I'm just chilling, you feel me? But like, b--ch, you wanna get one-on-one b--ch, you wanna f--king -- everywhere I motherf--king go b--ch because these b--ches be f--king playing with me. I got hands, you hear me? I got hands, b--ch, but if you come trying to jump me, I'm not, I'm . . . literally, Imma f--king . . . . Imma throw hands with each one . . . of y'all b--ches, but I'll shoot all of your all f--king legs, because I'm not trying to kill y'all b--ches, you're not worth . . . [shakes her backside twice at the camera]. I was so lit tonight and y'all b--ches just ruined my night. I'm mad as f--k and I'm drunk, bye.

As Defendant stated, "everywhere I motherf--king go," she pulled a black pistol out of the fanny pack and gestured with it to indicate that she carried the gun with her everywhere.

On cross-examination, Detective Landolt testified that the Snapchat files from April 14, 2019, did "not appear to be a direct video sent to [the victim]" but, rather, was a "story" Defendant "broadcasted out." He agreed that "this last video," presumably referring to the

8:28 UTC video in which Defendant brandished her gun and discussed shooting people in the legs, did not mention the victim by name.

Defense counsel requested that the trial court exclude the 8:28 UTC video because it was not sent to the victim and did not mention the victim by name. The State responded:

> Your Honor, for my argument, I'm going to use as a demonstrative, Exhibit 26, bullet from back. By itself, this is completely irrelevant, but when we start looking at it through the prism of all of the other surrounding exhibits; it becomes relevant. And the reason we know that this is relevant, is on the same day that she's railing against [the victim], that "dusty" B-word, she also references her friends, "and I've got something for you in the car." And then, in this collection of videos, somewhere in the middle of it, she goes[,] "I have something for you." Saying[,] "I'm not going to kill you, I'm going to shoot you in the leg." While she's waving around a pistol. We can infer that this is about [the victim], it's what all of these Snapchat memories, stories, whatever. It doesn't matter if it's broadcasted, it goes to her mental state. It goes towards the animosity and the premeditation. It doesn't matter if it was received by [the victim], because it's what's going on in her mind that the State is trying to prove. And that is -- that she hates [the victim], and she wants to shoot her and her friends.

The prosecutor confirmed that the three April 14, 2019 videos were filmed within an "hour or two" of one another. The trial court noted that Defendant's hair and clothing were the same in the three videos, that Defendant clearly referred to the victim in the first two videos, and that "a substantive tie-in [existed] between the substance of the middle one, and the last one." The court found that, because of the "proximity of time" of the three videos, the third video was not unfairly prejudicial. The court concluded that the third video was not offered as propensity evidence but rather to "show intent, premeditation, dislike for [the victim], and an intent to harm."

iv.     September 15, 2019 Snapchat video

Detective Landolt continued his testimony and stated that two additional Snapchat videos were dated September 15, 2019 ("September 15, 2019 Snapchat video"). The videos, which contained two halves of the same recording, were played for the trial court and reflected an unidentifiable figure in a dark environment; background noise similar to road noise made understanding all of the dialogue difficult. A woman's voice not belonging to Defendant was briefly audible before Defendant began talking in an agitated tone and said,

- 15 -

They fighting for real . . . . No b--ch better f--k with me though, no b--ch better f--k with me, you hear me? I'm shooting these b--ches, they trying to jump me b--ches. It's over with. We fighting one on one, b--ch, but I'm shooting. You come in here at me with a f--king group, it's over with this b--ch, bam bam in this b--ch, you hear me?

Defense counsel argued that the video should not be admitted as evidence because it did not reference the victim. When asked by the trial court how the State intended to tie the threat in the video to the victim, the prosecutor responded that one could "infer the folks that they're talking to based upon [Defendant's] prior statements about physical harm towards [the victim], and her friends. You hear in this video, with the group, if they come around it's going to be 'bam-bam, I'm tired of this.'"

The prosecutor noted that the Facebook evidence "might elucidate the issue" and resumed questioning Detective Landolt. Detective Landolt testified that the Facebook records he obtained showed "antagonizing communications" between the victim and Defendant "up unto" July 7, 2019. He agreed that a Facebook audio recording contained a discussion between Defendant and another individual detailing a confrontation between the victim and Defendant at CBC between the La Pachanga incident and the shooting.

Detective Landolt testified that the Walmart incident[9] sparked a "continued back and forth" between the victim and Defendant, including "threats and indications to fight each other." When asked whether Defendant "rail[ed] against" anyone else regularly on Facebook like she did the victim, Detective Landolt responded negatively. He stated, "It was primarily [the victim]. Yes, there were multiple . . . hot spots throughout that time period where . . . tempers would flare between the two of them."

Defense counsel argued that the Walmart incident had not been proven by clear and convincing evidence. The trial court noted that the parties did not play the first portion of the February 14, 2019 Snapchat video because they agreed that it was admissible. Upon questioning by the trial court, Detective Landolt affirmed his belief that, in July 2019, "there was information on Facebook that [Defendant] was going to confront [the victim] at CBC."[10] The court found that, based upon Detective Landolt's testimony, there was an

---

[9] The prosecutor asked, "[A]s it's going back and forth in July of 2019, was there an incident that took place in the Walmart in Cleveland, between [the victim] and [D]efendant[?]" The prosecutor then also referred to the video having been the first one played during the Rule 404(b) hearing. The record reflects that only one Walmart incident occurred in this case, and it was on February 14, 2019. Thus, it appears that the prosecutor misspoke when he said "July of 2019."

[10] We note that the only mention of CBC in the Facebook exhibit occurred on April 24, 2019, when Defendant reported to a friend that she encountered the victim there by chance.

- 16 -

ongoing dispute in which Defendant's "hostilities" were directed at the victim "earlier in the time period, April, and then in July, and now in September."

The trial court found that, in the totality of the circumstances,

the inference is – that all of this goes to intent, motive, premeditation, and to complete the story of the relationship between these women. It is highly prejudicial to have threats to shoot this woman, and "I'm over with this woman," just [five] days before the killing. But . . . I think given the entire relationship, it is not unfairly prejudicial. And the defense . . . I'm going to give a 404B instruction during the trial that they are only to consider this for evidence of intent, motive, premeditation[, and] to complete the story. And then you can inquire of all these witnesses whether or not there was any other woman that she was angry at.

v.      Facebook evidence

In response to a question from the prosecutor, defense counsel stated that he was not objecting to the State's printouts of Defendant's Facebook messages ("the Facebook exhibit"). Defense counsel noted, "I'm planning on using it, too." Upon questioning by the trial court, defense counsel said, "I wouldn't necessarily say [there is a] stipulation to it being entered, but I'm not objecting under [Rule] 404B."

Detective Landolt continued his testimony and stated that he received several Facebook audio messages between Defendant and the victim, including one sent on April 14, 2019. Defense counsel interjected that he would not object to any recordings Defendant sent to the victim.

An exhibit consisting of excerpts of Defendant's printed Facebook messages was introduced into evidence. Detective Landolt testified that Defendant sent an April 16, 2019 voice message to a user named "Makaylaa[11] Mkk." The record reflects that the message was sent at 2:16:03 UTC. The recording was played for the trial court and reflected Defendant's speaking in a softer tone. The recording began midsentence and consisted of the following:

friends after, and so we all went to the gas station and we smoked there, and I went home. And so on my way, I sent her my location, and I was like, b--

---

[11] The transcript lists this person's name as "Makayla, MKK," but the written Facebook exhibit reflects that the spelling is Makaylaa. We will refer to this person as Makaylaa for clarity.

ch where the f--k are you, like, I'm ready to meet you cause I wanna beat your a-- type s--t, and I'm drunk as f--k, bro, and this scary-a-- hoe, since she was alone, she didn't even wanna f--king send me her location, her p---y a-- was nah, all f--king big when she was [unintelligible] at home sleeping, like what.

Upon questioning by the trial court, the prosecutor stated that the message was sent in the general time frame of the La Pachanga incident and that, in the context of all the social media communications, it was apparent that Defendant was discussing the La Pachanga incident and the victim. The prosecutor averred that Defendant was "still fixated on" the victim. The prosecutor noted that other recordings would show that Defendant had asked the victim for her location and that the victim declined to come out to fight because she was at home and her friends were not present.

On cross-examination, Detective Landolt testified that the message was not published on social media and was not sent to the victim. Defense counsel argued that the voice message was inadmissible because there was "no intent for [the victim] to hear that, . . . and it was not published publicly."

The trial court found that, if a "sufficient tie-in" existed between the conversation with Makaylaa and the victim, "it all comes in." The trial court noted that the message would be excluded if an insufficient connection was demonstrated.

Detective Landolt continued his testimony and said that Defendant sent a Facebook voice message to a man named David Vasquez[12] at 2:15:36 UTC on April 16, 2019, which was played for the trial court. Based upon Detective Landolt's description, the corresponding recording reflected Defendant's speaking in a soft tone; again, the recording began midsentence. Defendant stated:

and I went next to my homeboy and his friend, and I was like what the f--k I been looking for y'all, whatever, and this b--ch just starts recording me. And so I went up to her and I was like, b--ch, what's up, like, you wanna fight? And the bouncer got in the way, my friend literally picked me up and f--king took me away, and dragged me, and she threw a beer bottle and hit one of the bouncers. And so, they literally dragged their dumb a--es out of that f--

---

[12] The witness misspoke here; the record reflects that Defendant sent a voice message to Makaylaa on April 16, 2019, at 2:15:36 UTC, not Mr. Vasquez. The trial court, relying upon the misstatement, also refers to the 2:15:36 UTC voice message as having been sent to Mr. Vasquez. The parties on appeal also refer to Mr. Vasquez in connection with this message. For accuracy, we will refer to the 2:15:36 UTC message as having been sent to Makaylaa.

king club, and so they banned from the club. They locked my a-- up in the club, the bouncer . . . wouldn't let me f--king go outside, and I was mad as h-ll. So I get outside, I grab my f--king bag, cause it's like four of them b--ches, and I don't give a f--k b--ch, I'm about to . . . beat the f--k out of all these b--ches cause I don't care . . . I have my strap in the car, and so I called the b--ch and I texted her[.]

Detective Landolt stated that the term "strap" referred to a firearm.

The trial court stated,

Well, what I heard, in this one is that she is relating back to . . . the throwing of the beer bottle ties this . . . to [the victim]. This message to [Makaylaa] relates back to the beer bottle, and [D]efendant says, "I called her." And so, that ties it in that it is [the victim] that her present hostilities are directed at. So, that goes to their ongoing relationship[,] intent, completing the story.

Detective Landolt continued his testimony and identified written Facebook messages that Defendant sent to the victim on April 14, 2019, at 7:41:05 UTC and 7:43:14 UTC, respectively, stating, "On my way to Cleveland B," and telling the victim to "[d]rop your location." Detective Landolt stated that the victim responded that she was at home in bed and did not give an address.

The trial court found that there was clear and convincing evidence that the messages were sent immediately before the 7:48 UTC video and that they "make a clear nexus between the hostilities that [D]efendant is speaking about [to Makaylaa] . . . tying them to her desire to fight with [the victim]." The trial court concluded that the message was admissible to "show intent, premeditation, and complete [the] story of a crime." The court noted that the message was "highly prejudicial" and that it would issue a limiting instruction pursuant to Rule 404(b).

Detective Landolt continued his testimony and agreed that Defendant sent an audio message on April 24, 2019, to Rhameika Coles. The message was played for the trial court and reflected that Defendant went to CBC and that the victim arrived some time later. Defendant stated that the victim did not know she was there, that the victim only stayed because she "tr[ied] to act hard," and that, when Defendant was about to leave, she asked the victim, "[S]o what's up, you trying to go outside, or you gonna meet somewhere b--ch, what's up[?]" Defendant stated, "[T]he b--ch did nothing but roll her f--king eyes at me, do her stupid little mouse f--king frog looking a-- f--king whatever she be doing" and walked over to her friend. Defendant noted that the victim had declined to fight her after

- 19 -

she had been doing "all that f--king capping on f--king social media[.]" Detective Landolt stated that, in a later text message, Defendant clarified, "It was just [M]iranda [S]tamper not the white b--ch."

Defense counsel argued that the message was not sent to the victim, that Defendant did not dispute that the encounter occurred, and that "[a]t some point, you've got duplicitous evidence here of just this confrontation between the two." The State responded that the message was evidence of another incident at CBC, which would later be the scene of the murder, in which Defendant wanted to go outside and fight the victim. The State argued that it established that Defendant knew the victim frequented CBC and that she attempted to get the victim to physically fight her there.

The trial court found that the message "identifies those two additional pieces; that it was at the very same location, and . . . trying to get her to go outside to fight." The court found that the message was not duplicitous and concluded that "this highly prejudicial evidence" was admissible because it went to "motive, intent, and the overall relationship of the parties."

At the conclusion of the jury-out hearing, defense counsel specifically objected to the trial court's giving a limiting instruction relative to the 404(b) evidence. He stated, "[T]he State can argue that this evidence goes toward motive, and possibly premeditation; that coming from the [c]ourt's mouth . . . I think is more prejudicial than not saying it. And so, I'm asking that it not be given as a curative instruction." Defense counsel confirmed that he was also requesting for the instruction not to be included in the final jury instructions.

The State responded that, to its knowledge, the trial court was required to include Tennessee Pattern Jury Instruction 42.10 in the final jury instructions. The trial court noted that "a whole line of cases" supported the court's issuing a limiting instruction. Defense counsel clarified that he objected to the use of the word premeditation in the instruction, and the trial court stated that, although it had "short-handed" the phrase "scheme or plan" as premeditation during its discussion, premeditation was not one of the permissible purposes included in the pattern jury instruction. The trial court agreed, though, that it would grant defense counsel's request not to instruct the jury on evidence of other crimes or bad acts during the trial.

When the jury returned to the courtroom, Detective Landolt testified that he was the lead investigator in this case. He identified Ms. Hernandez in the CBC surveillance recording as the woman who accompanied Defendant. Detective Landolt interviewed Ms. Hernandez at the police department and collected a GSR swab from Defendant. Detective

Landolt also observed the victim's autopsy and collected a DNA standard from the victim and a bullet recovered from the victim's back.

Detective Landolt testified that he had specialized training and experience in social media, cell phone, and computer-based investigations through his work for the Internet Crimes Against Children Task Force. Relative to Snapchat, Detective Landolt said that "snaps" were a photograph or video sent to another person on the platform, which would be deleted from Snapchat's servers after the recipient viewed it, although he noted that either the sender or recipient had the option to save it. Detective Landolt stated that "stories" were similar to a photograph or video, but they were "typically broadcasted to a group, and not necessarily sent to an individual person." He noted that a user could post multiple stories in a row "like a timeline" and that stories generally stayed on Snapchat's servers for one day, depending on the user's settings. Detective Landolt said that a "memory" was a service provided by Snapchat in which it would send a user a reminder of a video the user posted one year ago. He explained that memories were stored on Snapchat's servers and that he could "send legal process" to Snapchat to obtain them. Detective Landolt stated that a "chat" referred to a direct message between users that could contain text, photographs, and other media. He stated that, as opposed to snaps, chats could be retained on a person's account for extended periods of time.

Detective Landolt testified that he obtained a search warrant for Defendant's Snapchat account and Defendant's Facebook account, which had the username or "vanity name" "Tatted-baby-K." He explained that a vanity name was changeable and could reflect a person's nickname. He agreed that Defendant's Facebook records exceeded 10,000 pages in length and that he had "whittled down" the relevant communications to seventy-eight written pages and a selection of audio files. Detective Landolt stated that, similar to Snapchat, Facebook allowed public and private communications, which could consist of text messages, photographs, or audio or video recordings.

The State played the February 14, 2019 Walmart video for the jury. Detective Landolt stated that the victim was "directly behind the trash can in black" and that Defendant had recorded the video. He identified Defendant in the video.

The September 9, 2019 Snapchat recording of Defendant was played for the jury, and Detective Landolt identified Defendant in the recording and in the courtroom. He agreed that the recording was taken about eleven days before the shooting. Detective Landolt also agreed that the victim and Defendant had a "long-simmering feud" that had "hot-spots that would pop up from time to time." Detective Landolt explained that one such occurrence was the La Pachanga incident. The 7:48 UTC, 8:00 UTC, and 8:28 UTC videos were played for the jury. Detective Landolt defined the meaning of "never lacking"

and "strap." The September 15, 2019 Snapchat recording was also played for the jury; Detective Landolt identified Defendant's voice and a "faint" outline of her face in the video.

Detective Landolt testified that Facebook provided him with a PDF file containing Defendant's Facebook Messenger conversations with embedded photos and "a unique identifier that references a video or audio message." He agreed that the State had identified the messages that were "germane to the case" and put them into a PowerPoint presentation.

Detective Landolt testified that pages 2693 to 2724 of the written exhibit reflected Facebook Messenger conversations between Defendant and the victim beginning on February 14, 2019, and ending on July 6, 2019. Detective Landolt stated that, on March 14, 2019, the women had a conversation about wanting to fight, in which the victim stated, "B--ch I been working for my money since I was mf got d--m 15 b--ch. Been about my money hoe. H-ll why didn't you get out the car? You talk all that s--t but wanted to do a drive by?"

Detective Landolt read the following excerpts of the messages exchanged by Defendant and the victim on April 14, 2019:

| Time | Author | Message |
|---|---|---|
| 6:46:02 UTC | Defendant | Bet you won't meet me in Cleveland [h]oe |
| 6:46:15 UTC | Defendant | Wassuippp |
| 6:46:18 UTC | Defendant | Scary a[--] hoe |
| 6:46:25 UTC | The victim | What's up with it then b--ch |
| 6:47:18 UTC | Defendant | I got something for your dusty a-- |
| 6:47:22 UTC | Defendant | Wya [where you at] b--ch |
| 06:47:33 UTC | Defendant | One meet me in the car lmao [laugh my a-- off] |
| 06:47:35 UTC | The victim | On my way back to town nasty b--ch |
| 06:47:40 UTC | Defendant | You're not gonna leave |
| 6:47:51 UTC | Defendant | Better come with a bullet-proof vest |
| 06:47:59 UTC | The victim | P---y b--ch |
| 06:48:12 UTC | The victim | Fight like a man hoe |
| 7:07:29 UTC | Defendant | Cuz if your friends get in this 42 ain't finna hit soft |

Detective Landolt testified that people commonly referred to Glocks by their "model number" and that Defendant's last message meant "the Glock firearm isn't going to hit soft, and it's going to hurt."

Detective Landolt testified that his investigation reflected that Defendant was trying to get the victim fired from her job. He identified a photograph on page 2714 of the Facebook exhibit, which depicted a screenshot of a blank form used to send a message; the message subject was "Concern about my safety," and the text body consisted of a partial phrase reading, "the employee, Miranda Stamper."

Detective Landolt identified audio recordings of messages exchanged between Defendant and the victim on April 14, 2019, which were played for the jury and contained the following:

| Time | Author | Message |
|------|--------|---------|
| 7:53 UTC | Defendant | . . . so motherf--king hard because you don't got your b--ch -a-- friends, right? So back your b--ch a-- up, b--ch, what's up? Like . . . come on, let's have a one-on-one, b--ch, see if you so motherf--king hard, b--ch, what's up, cause I'm on my way now, I wasn't going to stop what the f--k I was doing, b--ch, cause you're . . . so f--king irrelevant b--ch, you wanna f--k up my motherf--king night b--ch, like you're so f--king ugly, you f--king dumba-- f--king dusty-a-- b--ch. |
| 7:56 UTC | The victim | . . . really think I give a f--k that I can't go back to that motherf--king club, man, f--k that club and you, b--ch, you can die in that hole, nobody give a f--k about your stupid a--, b--ch, the f--k you mean, bro, f--k you. |
| 7:57 UTC | Defendant | B--ch, first of all, first of all b--ch I was already there hoe, I done went offsite to smoke a f--king blunt, b--ch, ok, I been there since like f--king twelve, hoe, I happened to f--king go in there and see your b--ch a-- and I ain't even say s--t, b--ch, I mind my own motherf--king business, got my motherf--king drink, and went back there, b--ch, but your ugly a-- wanna f--king come and point at me, cause I wasn't even worried about your dusty a--, b--ch, ok, I wasn't worried about your f--king dusty a--, you dumb b--ch, I was having a good-a-- motherf--king time, b--ch, cause half of the motherf--king club in there b--ch know me, do you hear me b--ch, cause I'm the motherf--king s--t b--ch, you ain't s--t, you stupid-a-- hoe, and you know I will beat the f--k out of you, you wanna act so motherf--king hard b--ch, you're so f--king mad b--ch, you're so f--king mad b--ch, you a dusty-a-- b--ch, and you know I will beat the f--k out of you . . . anywhere I motherf--king see you, b--ch, so you better not |

| | | |
|---|---|---|
| | | motherf--king go to work, b--ch, you better call the motherf--king police when you see me, b--ch, cause I'm about to beat the f--k — |
| 7:58:15 UTC | Defendant | Everybody loves me, what do you mean, that's why everybody is like, f--king laughing at your f--king stupid a--, b--ch, your motherf--king own friends talk about your dumb a--, b--ch, you're not allowed at TBow's, you're not allowed at La Pachanga, because you're garbage, like, what the f--k, you're so dusty, like what the f--k are you wearing, like, uh, cheap-a-- Fashion Nova s--t, b--ch, like, what are you wearing those f--king Walmart sandals . . . don't you get a f--king discount, . . . that's why you wearing those cheap-a-- sandals, b--ch, get the f--k out of here, you f--king broke dusty-a-- b--ch. |
| 7:58:35 UTC | Defendant | . . . your a--, b--ch, you and your motherf--king friends, b--ch, f--k you mean, f--k all them ugly-a-- b--ches b--ch, yeah awesome, a whole motherf--king [unintelligible] b--ch, oh s--t, let me clap for . . . all the f--king gorillas, b--ch, ugly-a-- b--ches. |
| 7:59 UTC | Defendant | . . . g--d--- f--king drink, b--ch, you're drinking g--d--- beer, b--ch, you can't even afford a f--king real drink, you f--king broke-a-- hoe, f--k you mean, b--ch, wearing Walmart-a-- f--king shoes, b--ch. [laughs] B--ch get you some f--king like-- like you all b--ches like be sharing clothes and s--t, you all dusty a-- b--ches, like, come on, b--ch. You don't even --you don't even get to my f--king ankle, b--ch, you don't understand, b--ch, I'm the motherf--king s--t b--ch, you f--king dusty-a-- hoe. |

Detective Landolt testified that Defendant sent another audio message to the victim, dated April 14 2019, at 6:44 UTC, that was played for the jury and reflected Defendant's saying the following:

> You stupid-a-- f--king b--ch, bro, I bet you won't f--king meet me in Cleveland, hoe, I bet you won't f--king meet me in Cleveland, you scary-a-- b--ch, you talking all that s--t cause you with your friends, huh, but when I see you by yourself what the f--k you gonna do, hoe? I bet you won't f--king meet me in Cleveland right now, hoe . . . . Where the f--k are you at, b--ch? Pull up, b--ch, pull up b--ch, because you're a f--king scary-a-- hoe, b--ch.

Detective Landolt testified that, on July 6, 2019, Defendant sent the following audio message to the victim at 6:36 UTC:

[laughs] B--ch, who got time for your ugly a--, b--ch, I'm enjoying my day off, you know, cause I'm making big money unlike y'all little ugly a-- hos that are making what, ten dollars an hour?  B--ch, shut the f--k up, ok?  Shut the f--k up, ok.  Stop talking s--t, b--ch, ok . . . . [L]ike b--ch you really thought . . . you was gonna talk s--t and have somebody not f--k with me.  B--ch, f--k you.  Everybody seen those videos and I don't give two motherf--king f--ks, n---a, cause everybody know I got hacked.  I didn't post them videos, at least I'm not sucking d--k and getting f--ked like your little friends get f--ked, with them nasty-a-- f--king n---as they been f--king, like get the f--k out of here, ok?  Always f--k with [unintelligible] n---as, ok, do you hear me baby, ok?  Y'all nasty, y'all nasty, y'all be from bar to bar.  You know what I do, b--ch, work and be home, n---a, so kiss my motherf--king –[.]

Detective Landolt testified that the video Defendant referenced was one that depicted Defendant "undressed, doing a sexual act."  Detective Landolt stated that someone had sent the video to the victim.  He stated that a July 7, 2019 conversation between Defendant and "TD Brown" on page 9295 of the Facebook exhibit discussed the video.  In the conversation, Mr. Brown wrote, "What did Miranda put on snap[?]"  Defendant replied, "What you mean . . . .  Prolly that video of me my sister sen[t] her lmao that b--ch love sucking my d--k."

Detective Landolt testified that, on July 6, 2019, the victim sent Defendant an audio message at 6:39 UTC, which was played for the jury and was as follows: "Fight me, fight me, b--ch, fight me, fight me, I look like a gorilla, but I can still pull more n---as than your f--king stupid ugly a-- b--ch."

The record reflects that Defendant sent two audio messages to Makaylaa on April 16, 2019, which were played for the jury.  Detective Landolt stated that Defendant's reference in the messages to a "strap" in her car was to a gun.

Detective Landolt testified that, on April 24, 2019, Defendant sent an audio message to Ms. Coles, which was played for the jury.  He stated that the victim was killed in the CBC parking lot and that Defendant referenced CBC in the message to Ms. Coles.

On cross-examination, Detective Landolt said that he was not surprised that fingernail clippings from the victim contained a mixture of DNA, one of the contributors of which was male.  He noted that the presence of male DNA did not necessarily "imply

- 25 -

that she was in a fight with a male or anything like that" and opined that it would not be pertinent to his investigation.

Detective Landolt testified that he also gathered Facebook messages and other information from the data extraction performed on the victim's cell phone. Detective Landolt's investigation indicated that the conflict between Defendant and the victim began "over a dispute between [the victim's] friends and [Defendant] over . . . a male." He agreed that profanity was used by both sides.

Relative to the conversation Defendant and the victim had over Facebook on March 14, 2019, Detective Landolt read the following exchange aloud:

| Time | Author | Message |
|---|---|---|
| 19:49:08 UTC | The victim | I'm so mf tired of you b--ch I honestly can't wait for the day you don't wake up. I hate you bro. On god I hate you. |
| 19:49:13 UTC | The victim | You ain't s--t[13] |
| 19:49:21 UTC | The victim | I'm ready to fight you |
| 19:49:24 UTC | The victim | Been ready |
| 19:49:26 UTC | Defendant | She said she hate me [series of empty boxes] |
| 19:49:34 UTC | Defendant | I'm dead af |
| 19:49:41 UTC | Defendant | You hate me? I won |
| 19:49:44 UTC | Defendant | I don't hate you |

Detective Landolt testified that he saw a video recording on the victim's cell phone that depicted the victim's confronting Defendant in La Pachanga. He did not know if the victim uploaded the video to social media. The recording was played for the jury; it showed another person's filming Defendant, who was wearing the same floral blouse and black shorts as shown in the April 14, 2019 Snapchat videos, standing between some men with a drink in her hand. As the camera approached Defendant, she walked toward the camera, gestured repeatedly with her right middle finger, and said something inaudible; loud music was playing in the background. A woman's voice stated, "You're so g--d--m ugly, look at your f--kin' a-- b--ch." Just before the recording cut off, a man was visible stepping between Defendant and the camera. The trial court found that "if it's all from that same incident . . . all of this stuff . . . should come in." The State noted that it did not object to the recording.

---

[13] Defendant replied to this message, but all that was printed on the exhibit was a series of empty boxes.

Detective Landolt testified that some of the recordings Defendant created were made in response to being confronted by the victim. He acknowledged that, in the April 14, 2019 written exchange between the victim and Defendant, after the victim said, "Fight like a man hoe," the victim wrote, "She ain't wit it," and, "On god you almost got beat the f--k up."

Detective Landolt testified that the situation "cooled down" for the month of June, and that the conflict in July was a result of the victim's sharing the video of Defendant performing a sexual act alone. The video was received as an exhibit but was not played for the jury. He stated that, as far as he was aware, the video was not posted to social media, although he was not "a hundred percent sure about that" and did not dispute that it may have been posted. Detective Landolt said that the Facebook messages referenced the victim's showing the video to people.

Detective Landolt read aloud a Facebook message the victim sent Defendant on July 6, 2019, at 6:33 UTC, which stated, "B--ch your [sic] the last one to be telling me to be classy[.]" Later in that conversation at 7:01 UTC, Defendant wrote, "Nah you gonna be the one getting contacted by my lawyer dumb a-- lmao I heard you posted that video too my sister got a whole case on this and anyone passing this around going down too . . . . [S]he's paying me." Defendant also stated, "I'm contacting your job too." The victim responded, "Okay."

On redirect examination, Detective Landolt affirmed that Defendant told the victim and another person that the sexual recording originated from Defendant's sister. He agreed that Defendant threatened to shoot the victim and her friends but also told the victim that she did not hate her. He further agreed that Defendant attempted to confront the victim at CBC, referred to the victim's needing to wear a bullet-proof vest, and in a separate message told her, "[T]his 42 ain't finna hit soft."

Dr. Darinka Mileusnic-Polchan, an expert in forensic pathology, testified that she was the chief forensic pathologist for the Knox County Regional Forensic Center. Dr. Mileusnic-Polchan stated that the pathologist who performed the victim's autopsy, Dr. William Oliver, had since retired but that she had reviewed his autopsy report, the autopsy photographs, the toxicology report, the "report of medical legal death investigation," medical records, and law enforcement investigative records. She noted that she agreed with Dr. Oliver's findings.

Dr. Mileusnic-Polchan testified that the victim was twenty-two years old and that the cause of death was a gunshot wound to the chest; the manner of death was homicide. Dr. Mileusnic-Polchan stated that the victim suffered two gunshot wounds; the first, which

Dr. Oliver labeled "wound A," entered and exited the left breast and was a "downward oriented wound." She noted that there was a "relatively dense cluster of true gunpowder stippling," which meant that it had been fired at "relatively close range[.]"

Dr. Mileusnic-Polchan testified that two "schools of thought" existed regarding the range of gunshot wounds—the first "simplifies everything and calls the contact close range and distant or undetermined," whereas the second differentiated between close and intermediate range. Dr. Mileusnic-Polchan's preference was for the first method, whereas Dr. Oliver used the second method. She stated that the second method would classify a wound accompanied by soot and gunpowder as close range and a wound with only gunpowder as intermediate range. She said that her interpretation of close range equated to two to three feet of distance between the gun and the victim, depending on the gun and ammunition used. Dr. Oliver described both gunshot wounds as intermediate range.

The second gunshot, which Dr. Oliver labeled "wound B," entered close to the center of the body on the left and was also accompanied by stippling. Dr. Mileusnic-Polchan described the shot as "close range" but noted that the stippling was a "little bit kind of [a] wider spread" than wound A, meaning that the shot was fired from farther away. The trajectory of the bullet was left to right and upward, hitting the sternum and grazing the diaphragm, injuring the liver, lung, and heart before coming to a stop under the shoulder blade. The bullet was recovered, and Dr. Mileusnic-Polchan noted that the jacket was intact and that it left a small bruise on the victim's back.

When asked to opine on the order in which the gunshots occurred, Dr. Mileusnic-Polchan testified that she would "have to rely on the witness statements to decide." She reiterated that the shooter was aiming downward when the shot associated with wound A was fired, whereas the shot associated with wound B was aimed upward.

Dr. Mileusnic-Polchan testified that the victim also had superficial abrasions to the right forearm beside the elbow, on the left knee, and on the left upper back, as well as a "deeper abrasion" on the left knee, which she stated had occurred "perimortem" because they were not accompanied by a lot of bruising. The victim also had deeper abrasions on the left eyebrow and temple with an associated "subgaleal bruise" under the skin. Dr. Mileusnic-Polchan opined that the victim had collapsed face-down and was subsequently turned over.

Dr. Mileusnic-Polchan identified photographs of the victim's hands and stated that "no significant trauma" was found there. She noted that the autopsy report described "hyperemia over the metacarpal phalangeal joints" of the right hand but opined that she "didn't really see it" in the photographs. Dr. Mileusnic-Polchan said that hyperemia meant

"blood is in the vessel and the vessel is kind of distended," which resulted in the area's looking "loose, reddish." She stated that "a lot of resuscitation" had occurred, including applying a pulse oximeter and a tourniquet to assist in placing an IV line, and that the hyperemia could be an "artifact" from those efforts, or it could have occurred as the victim fell to the ground.

Dr. Mileusnic-Polchan testified that a defense pathologist, Dr. Steven Cogswell, issued a report in this case, in which he opined that all of the victim's injuries were caused by one bullet. She noted that Dr. Oliver discussed the victim's case with her in a "weekly . . . peer review meeting[]" and that they concluded that the victim's injuries resulted from two separate bullets. She stated that, if one bullet caused all the injuries, she would expect the trajectories to be left to right and downward; she remarked that, even accounting for changes in body position, "it would be very difficult to contort the individual in such a fashion to connect these wounds ideally perfectly to make one smooth single trajectory." She also noted that the "ring of abrasion" around wound B was on the bottom, indicating an upward trajectory, whereas the ring of abrasion around wound A indicated a downward trajectory.

Upon reviewing diagrams produced by Dr. Cogswell, which depicted the victim on the ground, Dr. Mileusnic-Polchan noted the "almost impossibility to contort the body in that direction" and that the victim's breast physiology did not produce any "significant kind of . . . pendulum effect" to make Dr. Cogswell's trajectory plausible.

On cross-examination, Dr. Mileusnic-Polchan testified that the victim's blood tested positive for "Delta-9 THC" and two marijuana metabolites, cocaine, and a cocaine metabolite. She said, though, that the toxicology findings did not affect the victim's cause of death and that she had considered the findings in her review of the autopsy report.

When asked whether she thought the victim was standing when she was shot, Dr. Mileusnic-Polchan testified that she did not know how the victim was positioned and that she could not distinguish between the victim's potentially collapsing from on her knees as opposed to standing. Dr. Mileusnic-Polchan stated that the victim had definitely hit her head from falling forward around the time of death.

Tennessee Bureau of Investigation (TBI) Special Agent forensic scientist Carrie Schmittgen, an expert in DNA and serology analysis, testified that she tested the Glock 42 pistol, magazine, and cartridge casing for DNA. The pistol contained a mixture of four individuals' DNA, including one male, and the profile was inconclusive. A swab from the edge of the roadway tested as blood and matched the victim's DNA. Swabs taken from the victim's right-hand fingernail clippings at autopsy matched the victim's DNA. Swabs

- 29 -

from the victim's left-hand fingernail clippings contained a mixture of at least two individuals; the major contributor matched the victim, and an inconclusive male profile was a minor contributor. She agreed that there was no way to tell how long DNA had been on a surface or how it got there. Agent Schmittgen acknowledged the possibility that DNA could have been transferred by a person's grabbing another person or holding or shaking hands.

TBI Special Agent forensic scientist Lindsey Anderson, an expert in gunshot residue analysis, testified that the GSR swab from Ms. Hernandez was negative for "gunshot primer residue." Defendant's GSR swab showed "multiple particles . . . characteristic of gunshot primer residue," indicating that she could have discharged, handled, or been near a firearm when it was discharged.

On cross-examination, Agent Anderson testified that, generally, GSR traveled an "arm's length" in every direction, depending on the firearm and the environment. She agreed that GSR could potentially "get all over everyone in the general area." She explained that TBI policy was not to test clothing items if a swab taken from an individual's person was positive.

TBI Special Agent forensic scientist Derek Proctor, an expert in firearms and ballistics, testified that he tested the Glock 42 pistol and examined the cartridge casing ejected from its chamber, as well as the casing found underneath the victim and the bullet recovered from her body at autopsy. He agreed that the gun was empty when it came to him. He stated that the pistol was in normal working condition, although it contained some "rust and some debris," and that the safety was operational.

Agent Proctor testified that a cartridge casing might not eject due to the slide's being obstructed, a problem with the ammunition, or if something in the pistol broke. Agent Proctor stated that the slide could be obstructed by its being placed against a hard object or a body part, or if tape or "some sort of binding" was wrapped around the slide. He agreed that a struggle over a gun in which someone grabbed it could prevent a cartridge casing from ejecting. He stated that, if the slide were pulled back incompletely, the cartridge casing could remain in the chamber.

Agent Proctor testified that the "trigger pull" of the Glock 42 pistol was "approximately eleven and three-quarters pound[s]," meaning it "require[d] more force to pull that trigger to the rear." He noted that it was a "heavier" trigger pull. After test firing the pistol, Agent Proctor determined that the cartridge casings collected at the scene and the bullet from the victim's body were fired by the pistol.

Agent Proctor performed a muzzle-to-garment distance determination on the victim's black tube top, in which he found gunpowder and lead particles "consistent with the passage of a bullet." However, no GSR pattern was present on the fabric, and he could not determine the distance from which the gun was fired. He said that he found a larger hole and a second, smaller hole within one-quarter inch of one another.

On cross-examination, Agent Proctor testified that a garment's being "contorted or wadded up," an object's being located between the muzzle and the victim, or "packaging, handling just the type of material" could possibly explain a lack of GSR pattern on fabric.

### d. Defense proof

Dr. Steven Cogswell, an expert in forensic pathology, testified for the defense. He stated that he reviewed Dr. Oliver's autopsy report, which he considered to be "very well done, very thorough [and] complete." Dr. Cogswell opined, though, that the victim's wounds were most likely caused by only one bullet. He stated that, consistent with how pathologists were trained, Dr. Oliver documented the victim's wounds and the trajectories in "standard anatomic position," which was "standing upright, arms down to your sides, palms towards the front."

Dr. Cogswell testified that, "if you simply bend the torso to the left side, twist the torso a little bit, and flex the torso forward, then account for the fact that the female breast is rather mobile, especially in relatively younger women, these pathways actually do line up[.]" Dr. Cogswell stated that wound B was "atypical," meaning that it was not oval or round because the bullet was destabilized by striking something before entering the body. He said that the bullet rotated and hit "slightly sideways," probably caused by the bullet's striking the victim's breast before it entered her torso.

Dr. Cogswell testified he performed "range of fire" testing[14] using the ammunition and a gun with the same barrel length as the Glock 42 to determine the stippling pattern at various distances. He concluded that the victim was likely about sixteen inches from the muzzle of the Glock 42 based upon the stippling found at autopsy.

---

[14] The trial court allowed Dr. Cogswell to testify about the ballistic testing he performed in this case after finding that he had specialized knowledge in the area. Dr. Cogswell stated that he attended an FBI workshop on "shooting incident reconstruction" in the early 1990s, "a number of Armorer's courses for various firearms," and training in a crime laboratory during his fellowship with the Miami-Dade County Medical Examiner's Office in 1990-91. He noted that assessing range of fire and trajectory was common in his work and that, if a crime laboratory had not already performed testing, "it's reasonable to try to do it as opposed to just taking the broad-based two to four feet range for intermediate range gunshot wounds . . . . [T]his is not a complex kind of testing to do. It just requires a little bit of detail."

Dr. Cogswell testified that he recreated the victim's positioning using a model close to the same height and weight and had an artist create drawings based upon Dr. Oliver's report of the external and internal injuries. Dr. Cogswell stated that, in order to produce a straight trajectory, the victim had to have been on the ground, partially upright on one elbow, rotated to the side and "flexed forward." He said that, based upon the pathways of injury observed by Dr. Oliver, it was unrealistic for the victim to have been standing or kneeling upright when she was shot.

On cross-examination, Dr. Cogswell testified that his report stated that no issues or "areas of potential argument" existed with Dr. Oliver's autopsy. Dr. Cogswell agreed that the hyperemia could have been caused by the victim's hand's hitting the concrete. He acknowledged that the model he used was a different person than the victim and that the gun he used in his testing was not a Glock 42. Dr. Cogswell maintained that the left breast was the most likely "intermediate target" to have destabilized the bullet. Dr. Cogswell testified that, in his assessment, the victim was lying on the ground, and the gun was "above her level and [was] pointed somewhat downward and backward." He said that the shooter would have been "standing or kneeling" and that the bullet's pathway was "downward relative to the ground."

On redirect examination, Dr. Cogswell had the defense investigator sit on the ground in the position of the victim, and he held his finger about sixteen inches away to represent the muzzle of the pistol. Defense counsel photographed the demonstration, and the photographs were marked for identification only. The defense investigator sat with his legs in front of him and his torso leaning backward. His left arm was rotated so that his left wrist was beside his upper, outer right thigh, and, although his right arm and shoulder were not visible, his posture was consistent with being propped up on his right elbow. Dr. Cogswell noted that he had no way to estimate the body position of the shooter; he said, though, that, by his theory of the victim's posture, the bullet had an overall downward trajectory, which appeared as an upward trajectory once the victim's body was straightened.

### e. Closing arguments

In the State's closing, it discussed the physical fight between the victim and Defendant and stated, "[A]t some point during the struggle, that gun that [D]efendant brought -- that Glock []42 'that ain't finna . . . hit soft,' she squeezed that trigger[.]" Later, the prosecutor stated, "Remember Agent Proctor here talked about that trigger pull, how heavy it was . . . . [I]t was 11 something pounds. Boom-boom, intentional." When discussing premeditation, the prosecutor noted the "long time dispute" between the victim and Defendant and that the victim was "not blameless" in the vulgar language used. The

prosecutor highlighted Defendant's statements: "[B]etter come with a bullet-proof vest" and, "[T]his []42 ain't finna . . . hit soft." The prosecutor asked the jury to consider in the ongoing dialogue, "[W]ho was talking about using a gun, who is threatening whose life? Who tells you what she's going to do[?]" In conclusion, the prosecutor said, "She came there with the purpose to kill [the victim], her only objective. This '[]42 ain't finna . . . hit soft. You better come with a bullet-proof vest,' -- the words of [D]efendant."

Defense counsel, in closing, conceded that Defendant killed the victim but argued that premeditation had not been proven. Defense counsel discussed that "[t]his began in February of 201[9] over a guy known as KY . . . . [T]his started over KY, and it developed into a hate-filled, profane, vulgar, long-term tirade back and forth on social media, and in person." Defense counsel noted that Defendant did not shoot the victim during the Walmart or La Pachanga incidents and stated that the victim and Defendant exchanged social media messages. Defense counsel said that Defendant "tells [the victim] she wants to fight . . . one on one, because if your friends get in this, '[]42 ain't finna . . . hit soft.'" Defense counsel also highlighted the context of Defendant's statements that "she's got something in the car for all of you B-words, plural. 'Better come with a bullet-proof vest[.]'" Defense counsel noted the intimate nature of the video the victim shared and posted on social media in July 2019, commenting that Defendant told the victim she was going to get an attorney instead of shooting her at that point. Defense counsel acknowledged Defendant's September 15, 2019 Snapchat recording in which she said, "I'm shooting, you come in here with a F-ing group, it's over with B-word, bam-bam[.]"

In rebuttal, the State noted that the murder did not occur in a vacuum and directed the jury to the Facebook exhibit on page 755, which reflected a March 14, 2019 status post in which Defendant wrote, "I'm a bully.[15] Idgaf [I don't give a f--k] I love to bully these hoes." The State argued that Defendant escalated the rhetoric and that, after Defendant said that her Glock 42 pistol was not fixing to hit soft, the victim responded, "duh TF [the f--k] . . . . [W]ho shoots folks?" The prosecutor played several video recordings for the jury related to the La Pachanga incident and stated that the conflict continued "until five days before [the victim] is murdered." The prosecutor continued, "And what happens on September the 20th? Bam-bam, bam-bam from this gun. Clear. From this []42 fired this bullet."

The prosecutor played the September 15, 2019 video and remarked, "[T]hose are her words, promises made to [the victim]. And we know she means business, because since April of 2019, she's been talking about doing exactly what she would turn out to do

---

[15] Our review of Exhibit 35 reflects that, in the overall context of the messages, it appears that Defendant was responding to being called a bully as a result of the conflict with the victim and her friends.

on September the 20th, 2019, and that is shoot [the victim]." The prosecutor again emphasized Defendant's statements about the bullet-proof vest and her Glock 42 pistol.

The jury convicted Defendant of first degree premeditated murder.

### f. Motion for new trial hearing

At the motion for new trial hearing, Defendant argued that the trial court erred by admitting the April 14, 2019 and September 9, 2019 Snapchat videos showing Defendant with her Glock 42[16] pistol, arguing that the videos did not have a sufficient nexus with Defendant's passing a background check at the time of the gun purchase in January 2018 to serve as rebuttal evidence. Defendant further argued that the videos had no nexus to the charged offense and that Defendant's using marijuana and using a firearm was character evidence. Defense counsel commented that the alleged illegal activity could not have been used to impeach Defendant's credibility as a witness. Defense counsel also asserted that Defendant's smoking marijuana did not serve to complete the story of the crime under Rule 404(b). Defendant argued that, because "we simply don't know where the threshold is with this Jury" as to prejudicial effect, and that "then we have to rule [in] favor of the defense, and argue that it could ha[ve] been prejudicial."

The trial court found that the inference that Defendant had no prior convictions was "good character evidence" that opened the door to challenge Defendant's good character. The court noted that it did not recall the marijuana use issue at the jury-out hearing. The trial court acknowledged that the evidence was highly prejudicial but found that it was not unfairly prejudicial. The court commented,

> I again, find that I made the correct decision on a very difficult evidentiary issue that was put before me. But considering the totality of the circumstances, and finding that the -- although it is prejudicial evidence, it is not unfairly prejudicial. And it was required . . . because the door was opened by the questioning regarding her lawful qualification to own a firearm together with the behaviors evidenced in these videos.

Defendant argued as a separate issue that the trial court erred by allowing the September 15, 2019 Snapchat video, arguing that clear and convincing evidence had not been presented to prove that Defendant was referring to the victim and that the video was highly prejudicial. The trial court found that, "listening to that time-line, and looking at the animus relationship between these women," clear and convincing evidence was

---

[16] Defendant does not dispute that the gun shown in the videos is the same gun used in the shooting.

presented of a "continuous pattern of threatening behavior, so as to make it clear to [the court] that the woman that was the subject of the threat was" the victim. The court noted that threats were often veiled, that the court and the jury attributed meaning to the threat, and that the court had issued a limiting instruction that the video was only to be considered for intent, motive, and premeditation.

Defendant argued as a further issue that the trial court erred by admitting "additional social media videos from Snap[c]hat and other platforms" of conversations Defendant had with third parties "discussing fighting the victim." Defense counsel noted that premeditation was an element of the offense and that including premeditation in the permissible considerations of bad acts evidence "goes awry with the Rule 42 instruction." The trial court noted, however, that it instructed the jury that the evidence could only be used to complete the story of the crime, as part of a common scheme or plan, to prove motive, or to prove Defendant's intent.

Finally, Defendant argued that the trial court erred by admitting Defendant's message to Ms. Coles regarding the April 24, 2019 CBC incident, arguing that it was duplicitous, had no evidentiary value, and "continues to show poor character on behalf of [D]efendant by her vulgar language." Defendant noted that it occurred five months before the murder and argued that the probative value did not outweigh the risk of unfair prejudice. The trial court found that, although the recording was "somewhat remote from the killing, it's still within that time-line of events that was the State's theory of the case. This brewing anger that resulted in the killing." The court concluded that it properly found that the recording went to intent, motive, and completing the story of the crime.

The trial court denied the motion for new trial, and Defendant timely appealed.

## II. Analysis

On appeal, Defendant contends that the trial court erred by admitting the April 14 and September 9, 2019 Snapchat videos[17] under Tennessee Rule of Evidence 404(a), arguing that defense counsel did not open the door to rebuttal character evidence and that, even if the door was opened, extrinsic evidence of specific acts was impermissible rebuttal evidence pursuant to Tennessee Rule of Evidence 405. Defendant acknowledges that she did not assert the extrinsic evidence argument in the trial court and requests plain error review.

---

[17] We note that, in her argument, Defendant does not articulate to which Snapchat videos she is referring; however, she cites to pages of the motion for new trial transcript in which Defendant raised the admissibility of the April 14 and September 9, 2019 Snapchat videos.

Defendant also contends that the trial court erred by admitting several pieces of social media evidence pursuant to Tennessee Rule of Evidence 404(b). Specifically, she argues that there was not clear and convincing evidence that the September 15, 2019 Snapchat video referred to the victim and that the video was not probative of intent or motive but only a propensity for violence. Second, Defendant argues that her message to Ms. Coles on April 24, 2019, was duplicative and unfairly prejudicial because the encounter at CBC ended peacefully, did not establish Defendant's intent on the night of the shooting, and did not demonstrate a motive for the shooting because "nothing erupted" between the women until the victim shared Defendant's sexual video in July 2019.

Similarly, Defendant asserts that the April 16, 2019 Facebook audio messages to Makaylaa were duplicative, had "no further probative value into the events of September 20, 2019," and were unnecessary to establish intent or motive or to complete the story of the crime. Defendant also argues generally that the trial court erred in admitting additional "Facebook Messenger text and audio messages." We note that Defendant's brief claims that Defendant only "took issue with the admission of the . . . audio message to Rhameika Coles as erroneous under Rule 404(b)" and requests plain error review of the remaining Facebook evidence. Finally, Defendant argues that the cumulative effect of these errors entitles her to a new trial.

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion in ruling the evidence inadmissible." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (first citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); then citing *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id.*

Tennessee Rule of Evidence 401 states that evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(a)(2) states generally, "Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: . . . [i]n a criminal case, . . . evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same[.]" Tenn. R. Evid. 404(a)(1). A defendant may open the door to rebuttal character evidence by placing her character at issue. *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012) (stating that, "if evidence of prior bad acts of a defendant is inadmissible, the defendant may open the door to admission of that evidence by putting his character at issue") (first citing Tenn. R. Evid. 404(a)(1), (2); then citing Tenn. R. Evid. 405(a)).

The State may present rebuttal proof of the defendant's character in the form of reputation or opinion testimony. Tenn. R. Evid. 405(a); *State v. Taylor*, No. W2012-02535-CCA-R3-CD, 2014 WL 4922629, at *45 (Tenn. Crim. App. Sept. 30, 2014), *perm. app. denied* (Tenn. Jan. 16, 2015). Additionally, the State may cross-examine witnesses about specific instances of conduct if the following conditions are satisfied:

(1) [t]he court *upon request* must hold a hearing outside the jury's presence, (2) [t]he court must determine that a reasonable factual basis exists for the inquiry, and (3) [t]he court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

Tenn. R. Evid. 405(a) (emphasis added); *see also Taylor*, 2014 WL 4922629, at *45-46.

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

- 37 -

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985).

Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989)). We will reverse the trial court's decision for abuse of discretion "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

### a. *8:28 UTC video and September 9, 2019 Snapchat video*

Defendant contends that she did not open the door to character evidence because the State introduced the ATF trace report as an exhibit and defense counsel simply reiterated the content of the State's exhibit. The State responds that the trial court did not abuse its discretion by finding that Defendant opened the door by this line of questioning.

Defendant further argues for the first time on appeal that the trial court erred by allowing the State to provide extrinsic evidence of specific instances of conduct, i.e., her waving or displaying Defendant's Glock 42 pistol in the 8:28 UTC video and September 9, 2019 Snapchat video. *See* Tenn. R. Evid. 405. Defendant acknowledges that she has waived plenary review and requests plain error review. The State responds that Tennessee Rule of Evidence 405 "is not implicated because [D]efendant presented her character

evidence, not by reputation or opinion of another person, but by reference to her own assertion of lawfulness [in] her application to purchase a firearm." In her reply brief, Defendant counters, "Rule 405 is always implicated in any examination of the admission of character evidence under Rule 404(a) because it governs the procedure for introducing all character evidence . . . . This procedure is the same for any party who seeks to enter the character evidence." Neither party cites to any authority[18] outside the language of Rules 404 and 405 in support of their claims.

Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id*. at 641-42; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that she is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

In this case, we cannot conclude that the trial court abused its discretion by finding that Defendant opened the door to character evidence by drawing attention to her

---

[18] We note that Defendant cites to *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004) when arguing that "[t]his propensity evidence infringed upon [Defendant's] right to a fair trial 'by inviting the trier of fact to improperly infer that the defendant has a propensity to commit crimes.'" (internal quotation marks omitted). *Denton*'s discussion of propensity occurred in the context of the improper joinder of multiple sexual offenses committed against eleven different victims over a period of years and is not analogous to Defendant's case.

previously passed background check during Agent Clark's cross-examination. Although Defendant correctly states that her Firearms Transaction Record contains her assertions that, at the time of the purchase, she had not been convicted of a felony and had not been indicted for a felony offense, neither the Firearms Transaction Record nor the ATF trace report explicitly state that Defendant passed an ATF background check. Accordingly, the State did not introduce the concept that Defendant successfully passed a background check, and the trial court was within its discretion to find that the line of questioning opened the door to rebuttal character evidence. *McCaleb*, 582 S.W.3d at 186.

Having found that character evidence was admissible, Rule 405 provides that rebuttal character "proof may be made by testimony as to reputation or . . . in the form of an opinion." The State did not introduce reputation or opinion testimony in this case. The State similarly did not inquire "on cross-examination . . . into relevant specific instances of conduct" because the original character evidence at issue came from a State's witness.

The Advisory Commission Comments to Rule 405 state that

Cross-examination of character witnesses for the accused raises a delicate problem. The examining lawyer can ask the witness about rumored arrests and charges concerning the defendant, because the witness's knowledge of the rumors might impeach the witness in the eyes of the jurors. If the witness admits having heard unfavorable rumors, the jury may decide that the witness's reputation or opinion testimony is entitled to little weight. If the witness has not heard the rumors, the witness's testimony may likewise be taken with a grain of salt because the witness is unfamiliar with the accused or the accused's community.

The indirect effect of such a cross-examination may be the more damaging to the accused. While the jury will be instructed to consider the rumors only as affecting the character witness's credibility, the practical danger is that such rumors - even if untrue - place the defendant's character in a bad light with the jurors. In an effort to alleviate the problem, the proposed rule sets out detailed procedural safeguards. The cross-examiner must apply to the court for permission to inquire into specific instances of conduct, the jury must be excused, and the court must determine both that a factual basis exists and that probative value for impeachment outweighs prejudicial effect on the accused's character.

We agree with the State that, considering the language of Rule 405(a) and the Advisory Commission Comments, Rule 405 contemplates a scenario in which a defendant

has opened the door to character evidence pursuant to Rule 404(a) by the defendant's own testimony or that of a defense witness. *See, e.g., State v. Land*, No. M2018-02121-CCA-R3-CD, 2020 WL 821273, at *12 (Tenn. Crim. App. Feb. 19, 2020) (noting that the trial court improperly permitted the State to introduce extrinsic evidence of the defendant's threatening a detective after the defendant denied such on cross-examination), *perm. app. denied* (Tenn. July 20, 2020).

Here, the original character evidence at issue was Agent Clark's testimony on cross-examination; the State's "cross-examination" would have been redirect examination of its own witness. Consistent with the parties' lack of citations in their briefs, we have found no guidance in case law about how and whether Rule 405 applies in this unusual situation. Accordingly, Defendant has not carried the burden of establishing that a clear and unequivocal rule of law has been breached for purposes of plain error. *Cf. State v. Dotson*, 450 S.W.3d 1, 70 (Tenn. 2014) (declining to grant plain error relief when "the law was unsettled at the time of the defendant's trial and remains unsettled"); *State v. Fusco*, 404 S.W.3d 504, 535 (Tenn. Crim. App. 2012) (declining to grant plain error relief when "the jurisprudence on the topic is anything but clear.").

We further conclude that Defendant's substantial rights were not affected, and consideration of the error is not necessary to do substantial justice. Initially, we note that the marijuana-related evidence presented to the jury appears to have been limited to Defendant's saying in the 8:28 UTC video and one of the Facebook audio messages that she smoked a blunt prior to the La Pachanga incident and her saying after the incident that she intended to smoke another one at home. The State did not elicit testimony from Detective Landolt about the additional marijuana-related evidence he found in the social media accounts, and Defendant's having violated federal law by possessing a gun after using marijuana was not discussed in front of the jury. In the context of the vast amount of evidence presented at trial, any harm to Defendant's case was minimal; we note that the victim also had illegal substances in her blood at the time of her death.

Relative to the 8:48 UTC video and September 9, 2019 Snapchat video as a whole, they were admissible pursuant to Rule 404(b) as evidence of Defendant's intent and motive. In addition, although the two videos cast Defendant in a poor light, the evidence of premeditation based solely on what occurred at the crime scene was overwhelming.

In the light most favorable to the State, the evidence at trial established that Defendant armed herself, walked into CBC where the unarmed victim was socializing and in a generally good mood, and immediately confronted the victim, asking if they were going outside to fight. The victim's companions saw the victim's demeanor change when she saw Defendant and could tell that the women did not like one another; Ms. Byers

described the dynamic as "pretty volatile." In the surveillance recording, Defendant enters the building, confronts the victim, and exits within about one minute; Defendant can be seen reaching inside the left side of her jacket as she exits CBC. Once outside, Defendant and the victim briefly traded blows; although the eyewitness testimony differed somewhat on the timing of the first gunshot, the two women fell to the ground, and Defendant fired her gun twice at the unarmed victim, hitting her at least once and killing her. The witnesses consistently stated that the fight and shooting happened within seconds.

Dr. Cogswell's testimony also suggested that the victim was in a vulnerable position, partially prone on the ground, and shot from a higher angle. Both pathologists estimated that the victim was shot from between one and two feet away, suggesting that the gun did not discharge during a mutual struggle over it. Mr. Coffel testified that he had to elbow Defendant in the eye to restrain her and hold her on the ground to prevent her from trying to shoot the victim again. Mr. Belcher described Defendant's demeanor after the shooting as "rather lethargic," "evil," and "very unsettling." Mr. Coffel and Mr. Belcher respectively testified that, upon being told that she might have killed the victim, Defendant stated, "I don't give a f--k, she swung at me," and, "Honestly, I don't give a f--k. I hope I killed the b--ch." Ms. Nelson also testified that Defendant showed no remorse after the shooting. Mr. Headrick testified that Defendant was preoccupied with trying to give her cell phone to Ms. Hernandez and told her to "[t]ake my phone and get out of here, the police are coming." *See State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (stating that circumstances establishing premeditation can include the use of a deadly weapon upon an unarmed victim, the defendant's procurement of a weapon, and a defendant's calmness after a killing) (first citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); and then citing *State v. Pike*, 978 S.W.2d 904, 914-15 (Tenn. 1998)); *see also State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (stating that a jury may infer premeditation from the defendant's failure to render aid to the victim).

In short, the evidence of premeditation was overwhelming without consideration of the portions of the social media evidence referring to marijuana and showing Defendant dancing with her gun. Because Defendant cannot show that this alleged error affected the outcome of the trial, she has not shown that a substantial right has been affected or that correction of any error is necessary to do substantial justice. *See State v. Rimmer*, 623 S.W.3d 235, 287 (Tenn. 2021) ("Our review is limited to plain error, and we conclude that the Defendant has not shown that the admission of this evidence affected a substantial right. The substantial right inquiry under the plain error doctrine mirrors the harmless error analysis under Rule 36(b)."); *State v. Knowles*, 470 S.W.3d 416, 425 (Tenn. 2015) (characterizing the fifth factor as being that "substantial justice is at stake; that is, the error was so significant that it 'probably changed the outcome of the trial.'"). Defendant is not entitled to plain error relief on this basis.

### b. *September 15, 2019 Snapchat video*

Defendant contends that the trial court erred by admitting the September 15, 2019 Snapchat video pursuant to Rule 404(b), arguing that clear and convincing evidence did not establish that Defendant was referring to the victim and that, consequently, its probative value was low compared to the danger of unfair prejudice. Defendant acknowledges that the trial court followed the procedural requirements of Rule 404(b); accordingly, we examine the court's decision for an abuse of discretion.

Our supreme court elaborated on the clear and convincing standard in *State v. Jones*, 450 S.W.3d 866, 893 (Tenn. 2014), as follows:

> To meet the clear and convincing standard, the trial court must determine that the evidence offered to show the defendant's involvement in the other crime is not "'vague and uncertain.'" *State v. Fisher*, 670 S.W.2d 232, 236 (Tenn. Crim. App. 1983) (quoting *Wrather v. State*, 179 Tenn. 666, 169 S.W.2d 854, 858 (1943)). The clear and convincing evidence standard is more exacting than preponderance of the evidence but less exacting than beyond a reasonable doubt, and it requires that "'there [be] no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *State v. Kennedy*, 152 S.W.3d 16, 18 (Tenn. Crim. App. 2004) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992))[.] . . . The burden is on the State to establish by clear and convincing evidence that: (1) another crime was committed; and (2) the crime was committed by the defendant. *White* [*v. State*], 533 S.W.2d [735,] 743 [(Tenn. Crim. App. 1975)] (quoting *Wrather*, 169 S.W.2d at 858). "Only thus can identification, or other proof of guilt, of the accused in the pending case be aided by evidence of the [other] crime." *Id.* (quoting *Wrather*, 169 S.W.2d at 858).

Clear and convincing evidence "may be established exclusively by circumstantial evidence." *Id.* As with other decisions in the purview of the finder of fact, we "may not substitute our own inferences for those drawn by the trial court, which acted as the finder of fact in determining whether the proof . . . was clear and convincing." *Id.*

At the Rule 404(b) hearing, the trial court found the following:

> There is clear and convincing evidence that there is an ongoing problem between these two women. There is clear and convincing evidence that [Defendant] is directing her hostilities at [the victim]. And that's from earlier

in the time period, April, and then in July, and now in September. When . . . I look at the totality of the circumstances, the inference is – that all of this goes to intent, motive, premeditation, and to complete the story of the relationship between these women. It is highly prejudicial to have threats to shoot this woman, and "I'm over with this woman," just [five] days before the killing. But . . . I think given the entire relationship, it is not unfairly prejudicial. And the defense . . . I'm going to give a 404B instruction during the trial that they are only to consider this for evidence of intent, motive, premeditation[, and] to complete the story. And then you can inquire of all these witnesses whether or not there was any other woman that she was angry at.

As a preliminary matter, we note that the State agreed at oral argument that the 404(b) evidence in this case generally was not properly categorized as "completing the story" because no conceptual void existed without it. *See Gilliland*, 22 S.W.3d at 272 (stating that "contextual background evidence . . . may be offered as an 'other purpose' under Rule 404(b) when exclusion . . . would create a chronological or conceptual void in the presentation of the case" and significant jury confusion would result). The trial court found several times that various pieces of social media evidence served to complete the story of the crime. However, the trial court articulated multiple permissible purposes for each piece of evidence admitted, so any error in this regard was harmless. *See State v. Reynolds*, 635 S.W.3d 893, 928 (Tenn. 2021) (recognizing that evidentiary errors are ordinarily addressed as "non-constitutional error using the harmless error analysis of Rule 36(b) of the Tennessee Rules of Appellate Procedure").

We cannot conclude that the trial court abused its discretion by finding that Defendant was referring to the victim in the September 15, 2019 Snapchat video. Defendant's main complaint in this regard involves the trial court's relying on Detective Landolt's testimony that his review of Defendant's social media accounts reflected that Defendant did not exhibit ongoing hostility toward anyone other than the victim. However, we will not disturb the trial court's credibility determinations. *See Jones*, 450 S.W.3d at 893 (stating that this court "may not substitute our own inferences for those drawn by the trial court" as the factfinder). We note that the language Defendant used in the September 15 video relative to a group of people wanting to "jump" her versus fighting "one on one" was very similar to her prior language in the 8:48 UTC video, the 7:48 UTC video, Defendant's written April 14, 2019 Facebook message to the victim about fighting one on one—"[because] if your friends get in this 42 ain't finna hit soft"— and Defendant's April 16, 2019 audio message to Makaylaa about grabbing her bag "[be]cause it's like four of them b--ches." Although the evidence was circumstantial, in the context of all of the

- 44 -

evidence presented at the Rule 404(b) hearing, the trial court properly found that clear and convincing evidence established that Defendant was referring to the victim.

In addition, we disagree with Defendant that the message was relevant to no material issue other than a propensity for violence. Defendant was not merely exhibiting a predisposition to be violent—she was discussing shooting the victim and her friends, as she had been doing for months before she actually shot the victim. Threats directed at a homicide victim have been accepted as proof of intent and a "settled purpose" to harm the victim. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993) (discussing that the victims' filing charges against the defendant despite his threats to kill them was proof of his motive to kill them).

Defendant also argues that, because the "last argument between the two women was shown to be in July 2019, more than two months prior to the shooting, and nothing was referenced as an inciting incident" in the September 15, 2019 Snapchat video, it was not probative of motive. Finally, Defendant contends that the video was "too attenuated from the September 20, 2019 altercation to be useful to the jury to 'complete the story.'"

As we have stated above, the State concedes that the social media evidence was not admissible to fill a conceptual void and complete the story of the crime. However, the trial court did not abuse its discretion by finding that the September 15, 2019 Snapchat video was relevant to establish that the problems between the victim and Defendant were ongoing as proof of her motive to kill the victim on September 20, five days later. Defendant is not entitled to relief on this basis.

### c. *April 24, 2019 Facebook audio message to Ms. Coles*

Defendant argues that the trial court erred by admitting the April 24, 2019 Facebook audio message Defendant sent to Ms. Coles, asserting that the video's only purpose was "to establish that [Defendant] had the propensity to fight [the victim] at CBC" and that, because the encounter ended peacefully, its probative value of intent or motive for the shooting several months later was minimal. The State responds that the trial court did not abuse its discretion.

At the Rule 404(b) hearing, the trial court found that the message regarding the encounter Defendant had with the victim at CBC in April 2019, "identifies those two additional pieces; that it was at the very same location, and . . . trying to get her to go outside to fight." The court found that the message was not duplicitous and concluded that "this highly prejudicial evidence" was admissible because it went to "motive, intent, and the overall relationship of the parties."

Again, we cannot conclude that the trial court abused its discretion by admitting the April 24 message to Ms. Coles. Although the common location of the April CBC incident was prejudicial, it was not unfairly so, and it was relevant to Defendant's intent on the night of the shooting because it established that Defendant knew the victim frequented CBC and had tried to get her to go outside to fight there before.

In addition, Defendant's contention that the 404(b) evidence was "minimally probative" of motive because it did not speak to her specific mental state on September 20, 2019, is not well received. The State's theory of the case was that the conflict and relationship between the parties *as a whole* provided Defendant with a motive to commit the shooting, including that the motive and intent built over the seven-month quarrel. The trial court correctly found multiple times that the individual items of evidence were admissible as part of that larger context. *See State v. Turnbill*, 640 S.W.2d 40, 46 (Tenn. Crim. App. 1982) (stating that the evidence of other crimes can be admissible because "relations existing between the defendant and the victim of a crime of violence are relevant"); *State v. Mendenhall*, No. M2010-01381-CCA-R3-CD, 2013 WL 360525, at *57 (Tenn. Crim. App. Jan. 30, 2013) (noting that repetitive letters and jail phone calls "showed that the [d]efendant had a prolonged and obsessive interest in the three victims" and were relevant to motive, intent, and absence of mistake), *perm. app. denied* (Tenn. June 11, 2013). Defendant is not entitled to relief on this basis.

### d. *Defendant's Facebook communications with Makaylaa*

As a preliminary matter, although Defendant avers that her contentions regarding the remainder of the social media evidence were not raised at the trial level, our review of the record indicates that Defendant raised the admissibility of her communications with third parties pursuant to Rule 404(b) at the motion for new trial hearing. Although the issue was framed broadly, it conceivably covered Defendant's April 16, 2019 messages to Makaylaa, and we will extend plenary review to it.

At the jury-out hearing, the trial court found relative to the David Vasquez/Makaylaa audio recording that Defendant was discussing the victim based upon Defendant's recounting details of the La Pachanga incident, such as the victim's throwing a bottle at her, and stating that she called the person about whom she was talking. The court concluded that the messages were probative of "their ongoing relationship[,] intent, [and] completing the story." Similarly, the trial court stated relative to the other message Defendant sent to Makaylaa that, if a sufficient "tie-in" existed between the message and the victim, it was also admissible. The trial court did not abuse its discretion by finding that the recordings were admissible and probative of Defendant's intent in the context of

the overall relationship she and the victim cultivated over time. *See Mendenhall*, 2013 WL 360525, at *57. Defendant is not entitled to relief on this basis.

### e. *Remaining social media evidence*

Defendant contends for the first time on appeal that the trial court erred by admitting "72 pages of [Defendant's] Facebook . . . text messages" and "at least 10 different Facebook audio messages," arguing that they had no purpose other than to establish a propensity for violence. Defendant specifically contests the admissibility of the April 14, 2019 text messages she sent to the victim, stating, "On my way to Cleveland B," "Drop your location," "Better come with a bullet-proof vest," and "Cause if your friends get in this, 42 ain't finna hit soft," as well as Defendant's texts to the victim about wanting to fight. Defendant also states that "a myriad of other mutual expletives between the two women, which the State used in its closing argument," were erroneously entered. Defendant's citations to the trial record reflect that, in addition to the above-referenced statements, she was referring to the victim's March 14, 2019 message asking why Defendant did not get out of the car when she saw the victim, stating, "You talk all that s--t but wanted to do a drive by?" and the earlier portion of the April 14, 2019 conversation between the victim and Defendant in which Defendant said, "Bet you won't meet me in Cleveland [h]oe," "I got something for your dusty a--," and asked the victim for her location. Defendant acknowledges that she has waived plenary review and requests plain error review.

To the extent that Defendant has raised the admissibility of communications between the victim and herself on plain error review, Defendant has not established that defense counsel had no tactical reason to waive the issue. *Adkisson*, 899 S.W.2d at 640-41. Our review of the record reflects that defense counsel stated multiple times that he had no objections to the communications, that he believed they were relevant, and that he intended to utilize the social media evidence and thus was not objecting to messages exchanged between Defendant and the victim. Counsel did, indeed, rely on portions of the social media evidence to cast doubt on Defendant's mental state on the night of the shooting and to highlight the victim's poor behavior. Because counsel's decisions were tactical in this regard, Defendant is not entitled to plain error relief.

Moreover, relative to the specific audio and text messages Defendant has raised, she has not established that consideration of the alleged error is necessary to do substantial justice. As discussed above, the evidence of premeditation was overwhelming. Defendant has failed to show that any error in the admission of a quantity of sordid social media interactions more probably than not affected the outcome of the trial. *See Reynolds*, 635 S.W.3d at 928. We note that defense counsel also utilized some of these conversations

tactically to suggest that Defendant did not hate the victim and was not upset by the victim's sharing Defendant's intimate video in July 2019. In addition, the recordings considered by the trial court were properly deemed to be relevant to Defendant's intent and motive, as informed by the continuing and escalating conflict between her and the victim. Defendant is not entitled to plain error relief.

To the extent that Defendant attempts to raise the admissibility of the remainder of Exhibit 35, she has not specifically detailed in her briefs the content to which she objects other than stating generally that the exhibit contains Defendant's online threats to the victim and conversations about the dispute with friends. We note that Exhibit 35 contains several tangential conversations between Defendant and third parties; in addition, a significant part of the seventy pages are identical conversations that, for unknown reasons, were repeated in the original 10,000-page document. Apart from the specific portions of Exhibit 35 set forth in the recitation of the facts of this opinion, the messages to which Defendant attempts to refer were not detailed at trial or considered by the trial court at the Rule 404(b) hearing, and it is not the function of this court to scour a voluminous exhibit and make Defendant's argument for her. Without more specific argument and citations to the record, this issue has been waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

### f. *Cumulative Error*

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but that "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *Hester*, 324 S.W.3d at 76. To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. In other words, only where there are multiple deficiencies does this court determine whether they were cumulatively prejudicial.

In this case, the only error we have identified was the trial court's determination that the 404(b) evidence was admissible as completing the story of the crime; however, we also concluded that the trial court properly found that the evidence was admissible as probative of Defendant's intent and motive. We acknowledge the potential cumulative effect of the admission of a large quantity of social media evidence, as occurred here. However, we conclude that because the evidence was otherwise admissible, and the other evidence of premeditation was so overwhelming, Defendant's right to a fair trial was not violated.

## III. Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE